In re John C. SIGRIST and Sue Ann M. Sigrist, Debtors.

CHEMICAL BANK, Plaintiff,

v.

John C. SIGRIST and Sue Ann M. Sigrist, Defendants.

In re Dennis J. HUGHEY, Debtor.

MANUFACTURERS & TRADERS TRUST CO., Plaintiff,

v.

Dennis J. HUGHEY, Defendant.

Bankruptcy Nos. 93–10130 K, 93–10904 K. Adv. Nos. 93–1087 K, 93–1174 K.

United States Bankruptcy Court, W.D. New York.

Feb. 18, 1994.

Robert S. Cooper, Rochester, NY, for plaintiff/Chemical Bank.

Eric A. Bloom, Allen, Lippes & Shonn, Buffalo, NY, for defendants John C. and Sue Ann M. Sigrist.

Raymond C. Stilwell, Relin and Goldstein, Rochester, NY, for plaintiff Manufacturers & Traders Trust Co.

Dennis C. Gaughan, Hamburg, NY, for defendant Dennis J. Hughey.

## OPINION AND ORDER

MICHAEL J. KAPLAN, Chief Judge.

These are two Adversary Proceedings in which fraud is alleged under 11 U.S.C. § 523(a)(2)(A) against Chapter 7 debtors. There is no commonality of parties, and the actions were tried separately. However, the Court has consolidated them for purposes of decision only, as they turn on a common issue of law.

In the Sigrist case, Chemical Bank issued a "pre-approved" credit card to the Debtors while they were already insolvent, and Chemical asks the Court to rule that the Debtors' use of the card while they were insolvent constituted fraud or false pretense, so that the resulting balance (approximately $5600) at the time of bankruptcy 3½ months later would be nondischargeable under 11 U.S.C. § 523(a)(2)(A).

In the Hughey case, M & T Bank seeks the same declaration as to a balance in a similar amount remaining on a very different type of account—a car loan. It would seem nearly impossible for such an issue to arise in that context, since one would expect that either the loan application was untruthful or else the insolvency would be discovered by the lender. But here the parties have entered into an unusual stipulation with a bizarre consequence: although Mr. Hughey's auto loan application was not completely filled out and consequently failed to disclose certain expenses which might have demonstrated an inability to handle the car loan, M & T has stipulated that the application was not a "false financial statement," and has voluntarily abandoned its § 523(a)(2)(B) cause of action, in exchange for the Debtor's stipulation that M & T acted "reasonably" in relying upon the application in granting the loan. Thus, M & T argues only that Hughey's act of seeking the loan at a time when he knew or should have known that he could not afford it, constitutes fraud or false pretense under § 523(a)(2)(A).

(Although the facts as submitted to the Court in the Hughey case are therefore, sui generis, the Court has observed a trend among lenders in the hotly competitive consumer lending market, to ask prospective

borrowers for less and less information (the "pre-approved" credit card being the ultimate example), while asking the bankruptcy courts more and more often to infer fraud on the part of the borrowers. The Hughey case portends the eventual "pre-approved" car loan.)

The Court holds:

(1) Oral or "implied" representations by a consumer debtor regarding ability to repay are not actionable under 11 U.S.C. § 523(a)(2). Representations regarding financial condition are actionable only if they were made in writing, in which case it is 11 U.S.C. § 523(a)(2)(B) that applies, not § 523(a)(2)(A). (It is respectfully submitted that cases in which use of a credit card or other actions of a debtor have been held to constitute an "implied representation of ability to repay" and which have sustained a § 523(a)(2)(A) cause of action for "fraud" on that basis alone, are wrongly decided.)

(2) Even if this Court's first holding is in error, fraud may not be inferred, under 11 U.S.C. § 523(a)(2)(A), in favor of one who lends to one who is already insolvent without inquiring as to solvency, if the allegation of fraud is grounded solely in the debtor's incurring of the debt in question at a time when he or the debtor knew or should have known that he or she was insolvent. In other words, any so-called "implied (mis)representation of ability to repay" cannot sustain an inference of fraud under § 523(a)(2)(A), where the lender has in fact made the credit available without regard to the debtor's ability to repay.[1]

(3) Insolvency at the time the debtor incurs the debt may be relevant to a claim that the debtor incurred the debt with an intention never to repay the debt, which claim is an actionable claim under 11 U.S.C. § 523(a)(2)(A).

(4) Chemical Bank has not carried the burden of proving, by a fair preponderance of the evidence, that the Sigrists had an intention not to repay[2] the debts at the time they incurred the debts to Chemical.

(5) M & T Bank has not carried the burden of proving, by a fair preponderance of the evidence, that Hughey intended not to repay, at the time he applied for and received and used the auto loan.

## THE FACTS OF SIGRIST

This is a core proceeding under 28 U.S.C. § 157 by which Chemical Bank seeks to establish the non-dischargeability of $5,639.29, plus costs, interest, and disbursements, arising from Mr. and Mrs. Sigrist's use of a Chemical Bank Visa and Convenience Check Account between October 4, 1992 and November 16, 1992, which period of use was followed by their consultation with counsel in December of 1992 and their filing of a Chapter 7 petition on January 20, 1993.

The matter was tried on December 9, 1993. The Court renders the following findings of fact.

As of the date of filing of the Chapter 7 petition, debtors owed over $40,000 in unsecured debt, nearly all of which was owed on ten bank card accounts. Thus, by their own Schedules, they owed as of January 20, 1993 the following bank card debts:

| | |
|---|---|
| AT & T Universal Master Card | $ 1,963.47 |
| Chevy Chase Federal Savings Bank Visa | 5,912.10 |
| Colonial National Bank Mastercard | 4,310.49 |
| Greenwood Trust Co. Discover Card | 1,670.93 |
| Chemical Bank Visa | 5,485.12 |
| Household Credit Services Mastercard | 3,597.07 |
| Household Credit Services Visa | 1,288.31 |
| J.C. Penney National Bank | 2,561.29 |
| Nationsbank Visa | 7,380.97 |
| Wachovia Bank Visa | 2,895.37 |

---

**1.** "Without regard to the debtor's ability to repay" is used herein to mean without requiring an informative financial statement from the debtor. Credit reports coupled with profiles of "average" customers do not tell a lender anything about a particular debtor's ability to repay. "Fraud" is not to be defined as a debtor's normal conduct that is at deviance with the lender's model or profile of the hypothetical "preferred" (or even "average") borrower.

**2.** The Court leaves it to others to explain the distinction, if any, between "no intention to repay" and "an intention not to repay," and the significance of any such distinction in the present context.

The debtors also owed credit card debt to retail stores and others in excess of $2,000.

By their own Schedules and Statements, the combined gross income of the debtors in 1990 was approximately $32,000, approximately $34,000 in 1991, and approximately $33,000 in 1992. By their estimate, their average monthly expenses, reflected upon their Official Form "Schedule J," were $1900 not counting debt service. Their monthly net take home pay at the time of bankruptcy was approximately $2600, but this included pay from a part-time job obtained by Mrs. Sigrist only three months before the filing of the petition. She had previously been unemployed for approximately two years. The couple have three children who were age 8 years, 4 years, and 8 months at the date of the filing of the petition.

Mr. Sigrist's income has remained relatively stable in the "low 30's" during the years 1990, 1991, and 1992.

The Sigrists have habitually spent beyond their means by use of credit cards. They admit that they already had sizeable debt and financial difficulty when they were notified in July of 1992 that Chemical Bank had "pre-approved" each of them for a Visa account—she in the amount of $5500 (despite not having worked in two years) and he in the amount of $2,000. Neither of them had solicited these accounts. Neither was asked even for their income, let alone their debts or expenses. (Appendix "A" to this Decision is a copy of the letter received by Mr. Sigrist. Mrs. Sigrist's was nearly identical, but for $5500 rather than $2500.)

The Sigrists say that they felt that they had always been able to meet the "minimum" obligations to "maintain" their credit card accounts, and that they could afford an added monthly payment on a $5500 additional debt, which monthly payment would be less than $125.00. (They claim not to have realized that they were only able to "maintain" their accounts by opening new ones.) Thus they accepted the invitation for the $5500 line of credit for Mrs. Sigrist, which Mr. Sigrist co-signed.[3]

Shortly thereafter the $5500 credit line was granted and on October 5, the debtors took a $3800 cash advance. By their own admission, this was by far the largest cash advance they had ever taken on any account, but they used it to pay a variety of unextraordinary expenses, plus a $1,000 obstetrics bill. They also immediately made small card charges to the "Armchair Shopper," "James River Traders," and "Value Vision." The very next day charges in excess of $100 each were incurred to "Harriet Carter" and "Chadwicks of Boston" as well as an $86.00 charge to "Troll, Learn and Play." The next day a $140 charge was incurred to "Lands End." Various smaller charges occurred on successive days for a variety of purposes including groceries, shoes, clothes, and medical needs, but also toys and gifts, until the total balance of $5,485.12 had been incurred during a 45-day period. Only a single $150 payment was made during or after this period on account of any of the obligations under this account. It is critical, perhaps decisive, to note that such usage was typical of the Sigrists' use of consumer credit for two or three years before Chemical "congratulated" them for their "good money management," with an offer of $8,000 of pre-approved credit.

During the period that these various charges were incurred on the new Chemical account, the Debtors were aware that they had already run at least eight other cards up to within $200 of their maximum credit lines. They knew or should have known[4] that they in fact paid more than $700 in October 1992 alone, to "maintain" their credit card accounts by making minimum payments, and knew or should have known that they had added over $19,000 in new consumer debt to their debt load in 1991 and 1992 alone, even

3. Although only Mrs. Sigrist testified, they stipulated that all decisions were joint decisions.

4. Mrs. Sigrist (who handled the family finances, but who conferred with Mr. Sigrist as to all decisions at issue) is an intelligent person with substantial experience in such matters. It is clear that she paid attention to the family's personal finances. Moreover, she worked more than 8 years as a store supervisor handling cash receipts and inventory at a photo developing outlet.

before they used the Chemical account in question.

They knew or should have known that throughout their five or more years of significant credit card use, they constantly charged more than they could repay, and had never paid a bank card back down to or near zero, even by using another card to do so.

The Debtors construct their defense of several elements: Firstly, no account was ever "past due," they always were "able to maintain everything." Next, they anticipated that using this account would add only a $115/mo. additional "minimum" payment to their debt load which they felt they could afford, particularly in light of the fact that Mrs. Sigrist had begun to work part-time. Next, they had not considered bankruptcy until Mr. Sigrist was advised of a long-term layoff, which notification came after the Chemical charges were incurred. (The layoff did in fact occur, but lasted only a few weeks.) Finally, they argue that Chemical offered them this unsolicited account when they were already in financial straits, and Chemical should not be heard to complain when they accepted the invitation and did exactly what Chemical "wanted" them to do, which (they claim) was to use the card and then to make only minimum payments on it so that interest earnings to Chemical would be high. (In fact, only one small ($150) payment was made on this account before bankruptcy.)

### THE FACTS OF HUGHEY

This too is a core proceeding under 28 U.S.C. § 157 and 11 U.S.C. § 523(a)(2)(A) wherein M & T Bank seeks to establish the non-dischargeability of $5076.99 plus interest since June 23, 1993, which amount is the deficiency balance after sale of a pick-up truck which secured an initial motor vehicle loan of over $19,000.

The case was tried on February 2, 1994. The Court renders the following findings:

The auto loan was made on or about January 14, 1993, and called for monthly payments of $391.53.

The loan application was prepared by a financing consultant at the truck dealership who asked pertinent questions of the Debtor, who was sitting with him. [It is Appendix B of this Decision.]

The Debtor is and was a boiler fireman. He was single in January of 1993. He was 29 years old. He earned $22,000 per year.

The M & T loan application signed by the Debtor and submitted by the dealer to M & T disclosed those facts and the fact that he had another M & T loan—a boat loan at less than $100/month—but no other information. Questions as to whether Hughey owned or rented his home were left blank.

M & T Bank compared the application with a credit report. M & T assumed that he had no housing expenses because housing information on his application had been left blank; it found no "red flags" on the application, on the credit report, or in reconciling the two; it approved the loan.

In fact, the Debtor had significant, but not unusual, monthly expenses related to housing: he paid $200 per month to his father for rent, plus $155 per month toward utilities, including telephone.[5] He also had three or four other modest debts (to a doctor, an attorney, a cellular phone service and his father.)

As of the date of the loan application, a $391.53 monthly payment for the new truck pushed the Debtor's monthly expenses (all of which were reasonable) over his actual monthly pay. (The monthly payment on the vehicle he traded-in is not in evidence, but it was to a different lender and was cashed out by the new loan.)

Within two or three weeks after taking delivery on the truck, the Debtor suffered a series of disasters and tragedies. The death of a close relative and the break-up of his engagement resulted in a suicide attempt by the Debtor and a 10–day stay in a hospital where he was urged to seek to relieve his

---

5. Hughey testified that the finance man at the dealership asked him merely "Where do you live?" When he said, "With my father," the subject was ended. He was not asked whether he pays rent. His testimony was uncontradicted.

various pressures, including financial pressures. Realizing that he had bitten off more than he could chew with a $391.53 payment, he went back to the dealer. The dealer took the vehicle, advised Hughey to let it be repossessed by M & T, and sold him an older, cheaper truck, helping him get financing from a different bank at a more affordable payment ($259 per month, with lower insurance payment as well).

Hughey then set up an immediate appointment to see a lawyer about bankruptcy; that meeting was to occur on February 23, 1993. But on that morning, his only brother, who suffers from Downs Syndrome, was seriously injured in a car crash in which another person was killed. Hughey put off his visit to the lawyer until his hospitalized brother was stabilized a couple of weeks later, on or about March 6, 1993. His Chapter 7 petition was filed March 16, 1993.

In the meantime, M & T repossessed its collateral, which had been sitting on the dealer's lot, treating it as a "voluntary surrender."

It was sold, and the $5076.99 deficiency is the amount at issue here.

Because of the uncontroverted evidence of the misfortunes befalling the Debtor in the weeks following the loan, M & T does not now assert any scheme or design by Hughey in contemplation of bankruptcy.

M & T had initially thought that Hughey had overstated his income on the application, and it had consequently emphasized a § 523(a)(2)(B) ["false financial statement"] cause of action during discovery. But it has since discovered that it was misinformed by extrinsic sources and has now abandoned that claim.

Now, a stipulation between the parties has presented the Court with an interpretive problem, but an interesting question. M & T now stipulates that the incomplete loan application, containing minimal information was not a "false financial statement" and abandons its § 523(a)(2)(B) cause, in exchange for which the Debtor stipulates that M & T did "rely" on the loan application and acted "reasonably" in so doing.

On the record, the Court confessed that it did not know what was being submitted for decision. Based on the responses at closing argument, the Court considers the question of law presented to be this:

If Hughey knew or should have known on January 14, 1993 that he could not afford the car loan, did it constitute fraud or false pretense or representation under § 523(a)(2)(A) for him to submit a truthful application which provided too little information for the lender to assess his true financial condition, and then accept the loan when it was approved.

The issue of fact is, of course, did he know (or should he have known) that he could not afford it.

He defends by arguing, in essence, that on January 14, 1993 he was considering only his income, not his expenses, and thought he could afford it. It was not until he received counselling during hospitalization after his suicide attempt that he faced reality and took steps to get his affairs in order.

### ANALYSIS

#### A. Purchase of Goods on Credit While Insolvent as "Fraud," Generally

The rule that conscious silence or conscious nondisclosure may be as fraudulent as an overt misrepresentation was a concept well understood in the common law as it applied to those in a relationship of trust. That the same might be true as between strangers seems to have been refined not as a matter of "frauds" that were actionable or indictable as such, but from mercantile law. Conscious concealment of insolvency when purchasing goods on credit was a "fraud" that resulted in a title to the goods that was defeasible and which gave rise to a right of reclamation in the seller.

Thus, in an early bankruptcy case the U.S. Supreme Court stated:

> The doctrine is now established by a preponderance of authority, that a party not intending to pay, who, as in this instance, induces the owner to sell him goods on credit by fraudulently concealing his insolvency and his intent not to pay for them is guilty of a fraud which entitles the vendor

... to disaffirm the contract and recover the goods.

*Donaldson v. Farwell,* 93 U.S. (3 Otto) 631, 23 L.Ed. 993 (1876)

More recently (1933), the Second Circuit, Learned Hand, J., writing, addressed the same point in an identical context, saying:

> [I]t has been settled by a number of decisions in federal courts that it is a fraud for an insolvent, concealing his condition, to buy goods, for which he does not mean to pay.... No difficulty in the application of this doctrine arises when it is proved that the buyer positively intends not to pay; but that is often not the case. He may mean to pay if he survives, though he knows that he is extremely unlikely to do so. If his promise declares only that he intends to pay, it would be hard in such a case to say that he has deceived the seller; and the doctrine presupposes some deceit. But promises, like other utterances, must be read with their usual implications. True, they are predictions and no one can foretell the future; the seller knows this as well as the buyer. However, a man's affairs may reach such a pass that ordinarily honest persons would no longer buy, if they had no greater chance to pay; and the seller is entitled to rely upon that implication. He may assume that the buyer would not promise if the odds were so heavy against him. He may read the promise as more than the declaration of a conditional intent, as affirming that that intent had reasonable hope of fruition. In that event, if the buyer knows that it has no such hope, he deceives the seller, as much as though he intended not to pay at all. This duty does not indeed depend upon what reasonable persons would think of his chances; or of how they would interpret the implication of his promise. But if he himself believes his position to be desperate, and if he understands his promise to mean what it normally would, the seller may rescind.

*California Conserving Co. v. D'Avanzo,* 62 F.2d 528 (2d Cir. 2 1933) [citations omitted.]

What might be "fraud" that supports a reclamation is not necessarily a non-dischargeable fraud, in light of the maxim that dischargeability provisions are to be construed liberally in favor of the Debtor. [See 3 Colliers, 15th Ed. ¶ 523.05[A]]

That distinction might have contributed to a view adopted by the Fifth Circuit in 1940 [6] (which was much criticized and later severely restricted in the portion of the former Fifth Circuit that became the Eleventh Circuit,[7] though at least one more recent panel in the new 11th Circuit believes it still to be the view) that "there must be actual overt false pretense or representation to come within the [§ 523(a)(2)(A) ] exception [to discharge]. The absence of explicit representations concerning financial conditions by the bankrupt requires a holding that there have been no false pretenses or false representations." [8]

Here in the Second Circuit, and in this District, there is no binding authority governing the discharge of consumer debt incurred while insolvent, by use of modern devices such as pre-approved credit cards.

It seems to the present Court that the Second Circuit's early statement quoted above, and the other Circuit's statement that "actual overt false pretense or representations" is required, are *both* correct, when dealing with credit extended while the debtor is insolvent, and without seeking information from the Debtor regarding ability to repay. The debtor is to be charged with the usual implications of his "utterance" that he intends to repay, but where the issuer has extended credit without regard to ability to repay, the issuer must prove some further design or scheme, such as (but not limited to) instances where the debts are incurred as part of a scheme "in contemplation of" bankruptcy.

**6.** *Davison–Paxon Co. v. Caldwell,* 115 F.2d 189 (5th Cir.1940).

**7.** *First National Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983).

**8.** *In re Hunter,* 780 F.2d 1577 (11th Cir.1986).

### B. Incurring Credit Card Debt While Insolvent as "Fraud"

1. 11 U.S.C. § 523(a)(2) is not available on the basis of an oral or "implied" representation of ability to repay.

■ Congress has provided that if fraud, false pretense or misrepresentation is to be based upon oral representation of ability to repay, then no action under 11 U.S.C. § 523(a)(2) may be sustained.[9] Only a *written* financial statement is actionable, and then the creditor's claim may be sustained only as set forth in § 523(a)(2)(B), not under common law principles of fraud or false pretense under § 523(a)(2)(A).

Numerous courts have so held,[10] and that view is so well-settled among those courts that the only debate remaining among them is the question of how "indirectly" might certain types of representations fall permissibly with the shelter of the doctrine.[11]

■ This Judge of this Court agrees, and if anything novel is to be found in the present decision in this regard, it is only that an "implied" representation of ability to repay must (not surprisingly) be even "less actionable" under 11 U.S.C. § 523(a)(2)(A) than an oral representation to similar effect.

■ Despite deep respect for other Courts that have held to the contrary, this Judge of this Court cannot agree that an "implied misrepresentation of ability to repay" can ever, of itself, sustain a judgment in favor of a creditor under 11 U.S.C. § 523(a)(2)(A), nor can an "implied misrepresentation of intent to repay" sustain such judgment if based solely on a lack of ability to repay.

■ However, as this Court held in *In re Shanahan*, 151 B.R. 44 (Bankr.W.D.N.Y. 1993), fraud may lie in credit card use during insolvency if something more than inability to repay is proven—if there is proven a totality of circumstances from which the Court might draw an inference of an intent not to repay.

C. Alternative Holding: Fraud may not be inferred from the sole fact that an available credit line was used while the Debtor was insolvent, if the line was granted while the Debtor was insolvent and was granted without regard to the Debtor's solvency.

(i) The proper use of "inferences"

■ Even if Congress had not seen fit to exclude verbal or "implied" representations of ability to repay from the purview of "false pretenses" or "actual" frauds actionable under 11 U.S.C. § 523(a)(2)(A), it would be error to sustain a lender's claim under that provision if based solely on the use of the credit while unable to pay.

As discussed below, other courts have reached a comparable result by employing theories such as assumption of the risk, waiver, estoppel, contributory negligence, or the like.

The present Court believes that the result is more firmly rooted in the role of "inferences" in the law. If the existence of fact "A" rationally supports the conclusion that there exists a certain fact "B," then a plaintiff whose cause of action requires establishing "B" is aided in sustaining its burden of proof: It needn't prove "B" (which might not be

9. In pertinent part, 11 U.S.C. § 523(a) provides that the discharge does not discharge "any debt ... (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or an insider's financial condition....*" It is § 523(a)(2)(B) that addresses so-called "false financial statements," and it requires that they be *in writing* if they are to form the basis of a non-dischargeability claim. (Emphasis added).

10. Consider, for example, *Blackwell v. Dabney*, 707 F.2d 490 (4th Cir.1983) and *Engler v. Van Steinburg*, 744 F.2d 1060 (4th Cir.1984), as well

as Bankruptcy Judge Schwartzberg's decision in *In re Schwartz*, 45 B.R. 354 (Bankr.S.D.N.Y. 1985), Bankruptcy Judge Berk's decision in *In re Gans*, 75 B.R. 474 (Bankr.S.D.N.Y.1987), Bankruptcy Judge Krechevsky's decision in *Matter of Richey*, 103 B.R. 25 (Bankr.Conn.1989); and Bankruptcy Judge Ryan's decision in *In re Mercado*, 144 B.R. 879 (Bankr.C.D.Cal.1992). See also 1 Norton Bankruptcy Law and Practice, sec. 27.40 and 3 Collier on Bankruptcy, 15th Cir., ¶ 523.08 at note 1b.

11. See Bankruptcy Judge Lorch's excellent analysis in *In re Olinger*, 160 B.R. 1004 (Bankr. S.D.Ind.1993).

susceptible of direct proof). It need only prove "A," and "B" may be inferred. Inferences, thus, are strictly creatures of logic and reason, and are substitutes for proof.[12] Further, rules of evidence that govern inferences to be drawn from facts are "to *aid* reason, rather than to *override* it."[13]

A lender does nothing "wrong" in lending without regard to creditworthiness. That is a matter of business judgment with which this Court has no proper concern. Such a lender's claim to repayment is just as strong as that of a pre-insolvency lender that meticulously inquired and satisfied itself of the debtor's creditworthiness. But the reasonableness or unreasonableness of the lender's decision to lend is totally irrelevant to its effort to establish that it was defrauded and that it is entitled to a judgment of nondischarge under 11 U.S.C. § 523(a)(2)(A).[14] Under that provision, the question is the extent to which an "inference of fraud" is available to a plaintiff who cannot prove fraud directly; inferences must not be contrary to the undisputed facts in evidence, or else the inference will fail of logic and reason.

It is the essence of the lesson taught by Judge Hand in the *D'Avanzo* case quoted above, that in the purchase of goods on credit from a merchant while insolvent the "deceit" is not in the buying as such, but in letting the seller rely upon the "usual implication" that there is a reasonable hope of repayment. *D'Avanzo* at 530. Trade creditors are not typically in a position to ask for a financial statement, but prospective lenders are.

### (ii) As applied to credit cards

Let us posit what might happen if an honest debtor could, and were to, communicate with the issuer of his or her credit card before each use of the card, and were to share with the creditor his or her reserva-

tions, if any, about having ability to repay. To "infer fraud" from concealing the fact of insolvency is to assume that in the face of an honest disclosure, the creditor would revoke the card. That the creditor would act so prudently—would not assume the risk—seems to be taken for granted.

In the case of a lender (a credit card issuer) who manifested some interest in the debtor's ability to repay when the credit was made available, it is both logical and rational to "assist" the plaintiff in meeting its burden of proof of fraud, by drawing such an inference.[15]

But I am of the view that such an inference is neither logical nor rational where the lender has extended "pre-approved" credit to an insolvent. To assume that such a lender would suddenly "care" belies the earlier disregard. Hence, the inference is not available to such plaintiff, and the plaintiff must prove fraud or false pretense by other means.

Furthermore, it does not suffice for the lender to say that because such communication is not available it is the debtor's duty to simply refrain from using the card, on penalty of an inference of fraud (or even on pain only of a mere implied misrepresentation of an ability to repay). Most debtors before this Court are here precisely *because* they did not know when they had passed the point of ability to repay; not all of those persons are chargeable with fraud. But of more importance analytically is the fact that lenders are not trade creditors. Lines of credit are to be used. To infer fraud from their use is totally contrary to the fact of the risks (and perceived profits to the lender) that underlie their issuance.

 This is by no means to say that the issuer of a pre-approved credit card to one

---

12. See the analysis at Jones on Evidence, 7th Ed. §§ 4.1 et seq.; McCormick on Evidence, 4th Ed. §§ 342 et seq.; and the definitive treatment at Tillers, Wigmore on Evidence, § 37.4.

13. *Maggio v. Zeitz*, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1942).

14. A "reasonable" decision to rely on a written financial statement is an essential element under § 523(a)(2)(B), on the other hand.

15. This is not to say that all such lenders are always entitled to the inference. Consider, for example, the current legislative interest in the matter of the extending of credit to gamblers on the floor of the casino. Even if creditworthiness was diligently examined, may an inference of fraud be drawn in favor of a plaintiff who cares not whether the debtor is acting rationally or irrationally, compulsively or with deliberation, etc.?

who is insolvent may never establish fraud, and this is the regard in which I disagree with the view that issuers "assume the risk" of fraud: Acts in contemplation of bankruptcy may be fraudulent as to such lenders, as might be acts that otherwise suggest an actual intent never to repay. The fact of insolvency may contribute to such a showing, but it does not alone suffice.

This Court respectfully disagrees with the view that the fact of pre-approval is not relevant under § 523(a)(2)(A)—the view that the focus is upon the actions of the debtor[16]—although the present court agrees that pre-approval does not "estop" the bank from asserting fraud. As explained above, the conduct of the plaintiff is relevant to the question of the inferences that may permissibly be drawn in assisting the plaintiff in carrying its burden of proof.

Of the nearly 40 other cases published thus far in which pre-approved credit cards were at issue, relatively few have focused upon the legal significance of pre-approval.[17] Among those that have done so, it is found that pre-approval was found to reinforce the view, which is binding in the Eleventh Circuit by virtue of *First National Bank v. Roddenberry,* 701 F.2d 927 (11th Cir.1983), that credit card issuers "assume the risk" and "cannot now complain that Debtors finagled [a grant of] credit through actual fraud."[18]

The Sixth Circuit has adopted a categorical view that it is "unreasonable" for a bank to rely upon a debtor's mere signature, his "supposed 'good faith'" and his "implied promise of repayment," and held that "misplaced trust" is insufficient for nondischargeability. A lender must investigate creditworthiness and ferret out ordinary credit information.[19] The Court reached its conclusion relying upon the traditional "five elements of fraud" analysis, which the present Court has respectfully suggested (*In re Shanahan,* 151 B.R. 44 (Bankr.W.D.N.Y.1993)) too severely limits the rights of credit card issuers; use of a credit card may be a fraudulent "device" or "artifice" as to which reliance is simply not at issue.[20]

This Court concurs fully with those Courts that have examined the totality of circumstances surrounding the use of the credit,[21] rejecting the notion of "implied representations" which (as explained in *Shanahan,* 151 B.R. 44) improperly reverses at least the burden of going forward, if not the burden of proof.

The present holding adds to those Courts' analysis only the proposition that the plaintiff's decision to lend to an insolvent is appropriately to be considered, and that the Court does so by treating that decision as a fact that negates the ability of the plaintiff to substitute an "inference of fraud" from the fact of insolvency; it must carry its burden of proving a fraudulent scheme or device without benefit of such an inference. Resort to notions of estoppel,[22] waiver,[23] the "doctrine

**16.** *In re Marlar,* 142 B.R. 304 (Bankr.E.D.Ark. 1992).

**17.** For example, in *In re Rouse,* 156 B.R. 314 (Bankr.M.D.Fla.1993), the Court seemed unfazed by the issuance of the pre-approved card after the debtor was laid off and on the eve of his going to jail, and it held the use of the card to obtain a $3500 cash advance to retain criminal counsel to be non-dischargeable. The present Court might possibly agree with that result, but it is not sure of the *Rouse* court's reasoning and of the facts as set forth in that decision.

**18.** *Matter of Cordova,* 153 B.R. 352 (Bankr. M.D.Fla.1993). (To the effect that *Roddenberry* is not so unequivocal, see *In re Wilson,* 32 B.R. 772 (Bankr.E.D.Tenn.1983), involving unsolicited "debit" cards.)

**19.** *In re Ward,* 857 F.2d 1082 (6th Cir.1988); accord, see *In re Leonard,* 158 B.R. 839 (Bankr. D.Col.1993).

**20.** Other Courts also have addressed use of preapproved accounts under the traditional "five elements of fraud" analysis and found "reliance" to be lacking: e.g., *In re DeLisle,* 125 B.R. 310 (Bankr.M.D.Fla.1991); *In re Schoeff,* 116 B.R. 119 (Bankr.N.D.Ind.1990); *In re Foley,* 156 B.R. 645 (Bankr.N.D.1993).

**21.** See, for example, *In re Dougherty,* 84 B.R. 653 (9th Cir. BAP 1988), adopting the analysis by Bankruptcy Judge Lindquist in *In re Faulk,* 69 B.R. 743 (Bankr.N.D.Ind.1986); and *In re Cacho,* 137 B.R. 864 (Bankr.N.D.Fla.1991). The progeny of *In re Dougherty* are numerous.

**22.** To this Court it seems that the proper function of "estoppel" is to prevent fraud (see 28 Am.Jur. 2d, Estoppel and Waiver § 28, at note 17), not to prevent one from asserting the fraud of others.

**23.** "Waiver" seems typically to require consideration in exchange therefor (see 28 Am.Jur.2d,

of avoidable consequences," [24] or even contributory negligence,[25] need not be had. ·

## CHEMICAL HAS NOT SUSTAINED ITS BURDEN AS TO THE SIGRISTS

■ Applying the above analysis to the facts of the Sigrists' case, the Court finds that Chemical has proven only that in accepting and using the pre-approved credit, the Debtors did so in the very same fashion that rendered them insolvent in the first place, over the ·course of two or more years of credit card · abuse—charging household expenses, clothes, gifts, necessities and luxuries in excess of their income. The $3800 cash advance was out of the ordinary, but so was the $1000 doctor's obstetrics bill paid from it. (The previous cash advances probably did not exceed $1500 each.)

The Sigrists knew or should have known that they had no reasonable expectation of ability to repay Chemical, but Chemical, as above, is not entitled to an inference of fraud from that fact.

Rather, Chemical must prove that that fact together with other facts (or other facts alone) demonstrate fraud. It has not done

so. The Sigrists' testimony that they were advised of an impending layoff only after they incurred the charges at issue was not rebutted, nor was their testimony that it was only then that they consulted an attorney.

These Debtors are the classic "victims/abusers" of credit cards. They sincerely believed that they could handle another monthly payment because they were "current" on all their other accounts. Of course, they were only "current" on their other accounts in the sense that they were making "minimum" payments, and were."current" on those only by grace of additional pre-approved credit. Chemical was the issuer at the end of the line. It has not proven itself to be a victim of fraud. Judgment is to be entered for the Debtors.

## M & T HAS NOT SUSTAINED ITS BURDEN AS TO HUGHEY

■ Applying the above analysis to Hughey's case, the Court finds that M & T has proven only that Hughey applied for .and obtained a loan to buy an expensive truck when he should have known better. Because M & T should have known better as well, M

---

Estoppel and Waiver §§ 158, 159), and it is conceptually difficult to charge Chemical and M & T with a "waiver" where the consideration flows from the millions of borrowers who do not default, rather from these Debtors. *See Matter of Robinson*, 55 B.R. 839 (Bankr.S.D.Ind.1985) which, though treating the issuer's conduct as manifesting an "assumption of the risk," focussed on the $6,000,000,000 a year in interest (as of 1985) supposedly being paid on 700,000,-000 credit cards held by Americans.

**24.** See 22 Am.Jur.2d, Damages §§ 495–504. That doctrine (like "mitigation") focuses on the plaintiff's conduct *after* perceiving the injury, not on whether the plaintiff acted prudently to avoid injury. Nonetheless, consider the "almost in-point" wisdom of the doctrine, which has been explained thusly: "... one is not prevented from recovering damages for a particular harm resulting from a tort if the tortfeasor intended the harm or was unaware of it and was recklessly disregardful of it, *unless the injured person with knowledge of the danger of the· harm intentionally or heedlessly failed to protect his own interests. The merely careless or stupid person is protected from consequences that the tortfeasor intended or was willing to have occurred, but the person who stubbornly refuses to protect his own interests is*

*subject to the rule of avoidable consequences."* Id. at § 503. (Emphasis added.)

**25.** See the citations contained at 37 Am.Jur.2d, Fraud and Deceit, § 247, offered in support of the following quotation: "The policy of the Courts is, on the one hand, to suppress fraud, and, on the other, not to encourage negligence and inattention to one's own interests. The rule of law is one of policy. Is it better to encourage negligence in the foolish, or fraud in the deceitful. Either course has obvious danger. But judicial experience exemplifies that the former is the less objectionable and hampers less the administration of pure justice. *The law is not designed to protect the vigilant, or tolerably vigilant, alone, although it rather favors them, but is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked."* (Emphasis added.)

The present Court suggests that when a lender has elected to loan to an insolvent, such lender may have to prove that the debtor was "designedly wicked" in the use of the credit, to sustain fraud. This does not mean that it must meet some kind of standard of "designed wickedness." Rather it means that it must prove actual fraud by means of actual evidence—a task that will be difficult except where other evidence is available of a true fraudulent design.

& T is not entitled to have the Court infer "fraud." (M & T has withdrawn any claim of a fraudulent "scheme" in light of the misfortunes that befell Hughey between the date of the loan and the petition date.) Judgment is to be entered for the Debtor.

SO ORDERED.

## EXHIBIT A

 **CHEMICAL**

Thomas C. Werbe
Vice President

100 Duffy Avenue
Hicksville, NY 11801-3699

```
CAR-RT SORT **CR07
John C. Sigrist
57B Williamsburg Sq.
Williamsville, NY 14221-6431
```

July 24, 1992

**A pre-approved $2,000 credit line.**

Dear John C. Sigrist:

Expanding your buying power has never been simpler than with the Chemical Bank VISA® Card. Just sign and return the attached certificate for a **pre-approved $2,000 credit line.**[†] We will send you the card whose services reflect the strength of one of the nation's largest banks -- Chemical Bank.

The introduction of our new *Shoppers Edge*℠ program makes this an even better time to sign for this pre-approved offer. *Shoppers Edge*℠, an exclusive service of Chemical Bank, is the most comprehensive buyer protection program offered by any credit card. You are covered on most items you buy with your card from the moment you leave the store. Features include:

- *Price Assurance*℠ -- if you see an item advertised in print for less, within 60 days of purchase, we will credit your account for the difference.
- *Satisfaction Guaranteed* -- if you change your mind about a purchase, we will give you a refund within 90 days of purchase when the store will not (effective Aug 1, 1992).
- *Purchase Security and Extended Warranty* -- protects your purchase against damage, and doubles the manufacturers warranty up to one additional year (effective Aug 1, 1992).

In addition to this new program, when you carry the Chemical Bank VISA you can...

- Shop, dine or entertain at over 9 million locations
- Utilize over 75,000 ATMs, around-the-clock
- Get cash at over 200,000 banking offices worldwide

(over, please)

See reverse for additional important information.
[†] **Pre-approved status is applicable only until September 8, 1992.**

1EA-831424460 .

*Please detach and return in the postage-paid envelope*

---

### ⟨ ⟩ *Pre-Approved Credit Line*

✓ YES, send my Chemical Bank VISA® Card.

You must be at least 18 years old to qualify. Offer depends on certificate completion and information verification, to ensure that the addressee is the individual responding on the certificate

Credit **$2,000**
Line:

**Offer Expires: September 8, 1992**

The following information is necessary prior to opening your account.

Signature X _____ Date _____
 (Required, not transferable)

Mother's Maiden Name _____ Social Security Number _____

City of Birth _____ Date of Birth _____

( ) _____ ( ) _____
Home Phone Business Phone

Employer's Name _____

Employer's Address _____

HN23-2PB-Q-E7-F

Will your spouse have use of this account? If yes, list the name below A card will be issued in your spouse's name and this account will be reported to the Consumer Reporting Agencies in both of your names. Please print name of spouse below.

If you would like an additional card in another name, please print name below.

Please enroll me in the optional Chargegard Protection program as described on reverse (not required to open your account). I have read and understand that coverages, benefits, exclusions, and rates may vary by state as disclosed on this form, that coverage is not required to obtain credit and that I may cancel at any time I authorize the premium to be billed to my account

Initial Here _____ Date _____

```
John C. Sigrist
57B Williamsburg Sq.
Williamsville, NY 14221-6431

· 1EA831424460-090892
```

See reverse side for further information

Q 237

And when you leave home, your VISA will provide...
- Travel Accident Insurance up to $100,000
- Guaranteed Reservations and Express Checkout at participating hotels, motels and resorts

Plus you get an assortment of convenient benefits including...
- VisaPhone℠, a long distance calling service from MCI® and VISA
- 24-hour customer service
- Additional cards at no extra cost

Send for it all today by using the attached pre-approved certificate and expand your buying power the easy way -- with the Chemical Bank VISA.

Sincerely,

*Thomas C Wlerbe*

Vice President
Chemical Bank

P.S. Sign for your card today and take advantage of the introduction of our new *Shoppers Edge℠* program. This comprehensive buyer protection program covers price, returns and warranty extension on most items you buy with your card. It is a service offered exclusively by Chemical Bank and provides security matched by no other credit card.

See brochure for further information.

ATMs Daily and transaction limits apply

VISA and VisaPhone are trademarks of Visa International. MCI is a registered service mark of MCI Communications Corporation

This letter contains a partial description of various benefits. Certain conditions, restrictions, claim filing procedures and exclusions may apply. Services and benefits are described in detail in the information sent to cardmembers. Many of the benefits described are provided by independent suppliers. Chemical Bank may add or withdraw services at any time

To enroll in Chargegard, you must be under age 70 (age 71 in AZ, FL, MI OK). In CA, CT, HI, IN NJ, RI, VT, WA, WI and WY maximum enrollment age is through age 64 (age 65 in IA, NY, OR & TX) and coverage ends at age 65 (age 66 in NY, OR & TX). In HI IN and VT, Life benefits convert to Accidental Death at age 65 (age 66 in IA). You, the primary cardmember, are eligible if you are employed full time in a non-seasonal occupation (this restriction does not apply in AZ, MI NM, OR and RI). Unemployment and disability coverages begin after 30 consecutive days of unemployment or disability, and are retroactive to the first day of loss. All benefits are based on the outstanding balance as of the date of loss and will continue until your balance is paid off, you return to work, or you reach the limits of the master policy, whichever occurs first. Only Life benefits are available to the second cardmember or the authorized user of the account. Benefits are not payable on purchases or advances made while claims are being paid and all benefits are subject to the master policy limit of $10,000. UNEMPLOYMENT BENEFIT: If you become involuntarily unemployed Chargegard will make your scheduled minimum monthly payments (maximum of six in NY), subject to the master policy limit. Retirement is not covered (Coverage not available in CT labor disputes/strikes excluded in AR, IL and NY). Unemployment due to medical disability is excluded. LIFE BENEFIT: If you or the second cardmember or authorized user die, Chargegard will pay the outstanding account balance as of the date of death up to the master policy limit (Suicide excluded except in MD and MO). DISABILITY BENEFIT: If you become disabled, Chargegard will make your scheduled minimum monthly payments as long as you are under a doctor's care and unable to work, up to the master policy limit. CHARGEGARD COSTS: 66c per $100 of your outstanding balance, 22c in CT, 37c in NY; 46 6c in TX, 46 9c in NH, 56 7c in VT, 57 5c in HI; 59c in WI, 59 1c in SC, 64c in NM, 64.8c in ND, 65 8c in AZ; 60c in CA, IA, ID, IN, MO, NJ, OR, RI, WA and WY. Coverage is underwritten by American Bankers Life Assurance Company of Florida and American Bankers Insurance Company of Florida. 11222 Quail Roost Drive, Miami Florida 33157-6596. In NY, Life and Disability coverages are provided by Bankers American Life Assurance Company. Texas certificate numbers - AC3161-CB(3 50 &3 53 R.A.), AD9139CO-0791 & B2754EO-1069
 NO COVERAGE IS AVAILABLE TO RESIDENTS IN MA, ME, MN, NC, and PA.

If the certificate is returned within a five week period after the expiration date, the bank reserves the right to obtain a credit bureau report and treat your response as an application. Certificates received after the five week period will not be honored. Respondents will be sent a full application

| Annual Percentage Rate for Purchases | Transaction Fee for Cash Advances, and Fees for Paying Late or Exceeding the Credit Limit |
|---|---|
| 17.8% | Transaction Fee for Cash Advances – 2% of the amount of the Advance ($10.00 maximum, $1.00 minimum). |
| **Method of Computing the Balance for Purchases** Average Daily Balance (including new Purchases). | Late Payment Fee–$15.00, if the amount due is $2.00 or more. Over-the-Credit Limit Fee–$15.00. |
| **Annual Fees** $20 Per Year | |
| **Grace Period for Repayment of Balances for Purchases** A grace period of not less than 25 days. | **Minimum Finance Charge** $0.50 for Purchases if a finance charge is imposed. |

Other fees may apply

The information about the costs of the card described in this application is accurate as of June, 1992, the date of printing. This information may have changed after that date. To find out what may have changed write us at Chemical Bank, P.O. Box 1010, Hicksville, New York 11802

State laws require the following notice CALIFORNIA RESIDENTS A married applicant may apply for a separate account. NEW YORK RESIDENTS The bank may at any time in the future obtain consumer reports to renew the account. Upon request, the bank must supply the name and address of the consumer reporting agency which gave the consumer report. WISCONSIN RESIDENTS Wisconsin law provides that any agreement, unilateral statement or court decree relating to marital property may not adversely affect a creditor's interest, unless prior to the time credit is granted the creditor is furnished a copy of the agreement, statement or decree, or has actual knowledge of the adverse provision. ILLINOIS RESIDENTS No applicant may be denied a credit card on account of race, color, religion, national origin, ancestry, age (between 40 and 70), sex, marital status, physical or mental handicap unrelated to the ability to pay or unfavorable discharge from military service

Residents of Illinois may contact the Illinois Commissioner of Banks and Trust Companies for comparative information on interest rates, charges, fees and grace periods. State of Illinois–CIP, P.O. Box 10181, Springfield Illinois 62791, 1 (800) 634 8452

OHIO RESIDENTS The Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy customers and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio civil rights commission administers compliance with this law

954

## EXHIBIT B

**M&T Bank** — Is this a joint application ☐ YES ☐ NO. If "YES", applicant 1 should fill in spaces marked 1 and applicant 2 spaces marked 2. If any information is the same for both applicants 2 may write in "SAME".

| NAME 1 | Dennis J HuGhey | BIRTHDATE 11/19/64 | DEP | PHONE NUMBER 9611 6736 | SOCIAL SECURITY NUMBER 107 60 7181 |

| ADDRESS 1 6686 Ombolius Rd Celida NY | CITY | STATE | ZIP 14033 | HOW LONG 5-YRS | PREVIOUS ADDRESS (IF CURRENT LESS THAN 5 YEARS) |

| EMPLOYER (NAME/ADDRESS) 1 Oak Molding 2 Lach NY | BUS. PHONE 628 964 | POSITION Boiler | HOW LONG 5 Year | BADGE NO. | GROSS MO. SALARY 22,000 yr | PREV. EMPLOYER | HOW LONG |

OTHER INCOME: ALIMONY, CHILD SUPPORT OR SEPARATE MAINTENANCE INCOME NEED NOT BE REVEALED IF YOU DO NOT WISH TO HAVE IT CONSIDERED AS A BASIS FOR REPAYING THIS OBLIGATION.

| SOURCE (NAME/ADDRESS) 1 | MO. AMOUN |
| 2 | |

PROPERTY INFORMATION: IF PROPERTY IS OWNED AND TAXES ARE NOT INCLUDED IN THE MONTHLY PAYMENT, LIST ANNUAL TAXES PAID IN THE SPACE PROVIDED BELOW.

| | | MO. PAYT. | ANNUAL TAXES | MORTGAGE BAL. | MORTGAGE HOLDER | CHECKING ACCT. AT | SAVINGS ACCT. AT |
|---|---|---|---|---|---|---|---|
| 1 | ☐ OWN ☐ RENT | | | | | | |
| 2 | ☐ OWN ☐ RENT | | | | | | |

LIST ALL DEBTS TO BANKS, STORES, FINANCE COMPANIES, CREDIT UNIONS AND OTHERS. INCLUDE ALL OBLIGATIONS TO PAY ALIMONY, CHILD SUPPORT OR SEPARATE MAINTENANCE.

| APPLICANT 1's CREDITORS | MO. PAYT. | BALANCE | APPLICANT 2's CREDITORS | MO. PAYT. | BALANCE |
|---|---|---|---|---|---|
| AUTO (YEAR/MAKE) | | | AUTO (YEAR/MAKE) | | |
| 1 | | | 1 | | |
| 2 MXI | | | 2 | | |
| 3 ACSI AUTO | | | 3 | | |
| 4 | | | 4 | | |
| 5 | | | 5 | | |
| 6 | | | 6 | | |

HAVE YOU EVER GONE THROUGH BANKRUPTCY? APPL. 1 ☐ YES ☐ NO APPL. 2 ☐ YES ☐ NO

HAVE YOU EVER HAD JUDGEMENTS OR GARNISHMENTS AGAINST YOU? APPL. 1 ☐ YES ☐ NO APPL. 2 ☐ YES ☐ NO

NEAREST RELATIVE NOT LIVING WITH YOU. (NAME/ADDRESS) (TO BE ANSWERED BY EITHER APPLICANT)

Name(s) to appear on certificate of title: _____

To Manufacturers and Traders Trust Company:

**INFORMATION.** All information given in this application is true, correct and complete, and is given for the purpose of obtaining credit from you. I authorize you to verify any information given in this application. In addition, I authorize you to obtain any information you feel is necessary in connection with this application or in connection with any review, update, renewal or collection of any credit you extend as a result of this application. Finally, I authorize you to give information about me and your credit experience with me to others such as banks, stores and credit reporting agencies.

**CREDIT REPORTS.** I understand you may request a credit report on me from a credit reporting agency in connection with this application or in connection with any update, extension or renewal of any credit you extend as a result of this application. In addition, I understand that, if I ask, you will tell me if a credit report was requested, and if so, the name and address of the credit reporting agency furnishing the report.

**KEEPING APPLICATION.** I agree that you may keep this application whether or not you approve it.

**ACKNOWLEDGEMENT.** I acknowledge receipt of a Notice Regarding Credit Reports.

| APPLICANT 1 SIGNATURE _____ | APPLICANT 2 SIGNATURE _____ | DATE _____ |

---

**This section for bank/dealer use only.**

| Dealer Emerling | Salesperson Saviario | Time | Date 1/12/93 | Phone 941/5255 |

| Vehicle description: ☐ New, ☐ Demo, ☐ Used. |
| Mileage _____ |
| Year 93 |
| Make Chevy |
| Model CJ1016 |
| Body _____ |
| Trade-in _____ |

| Cyl _____ |
| Automatic ☐ |
| Power Steering ☐ |
| Air Conditioning ☐ |
| Van Conversion ☐ |
| Vinyl Roof ☐ |
| 4 Wheel Drive ☐ |
| AM/FM _____ ☐ |
| Other _____ |
| Other _____ |

| Price (− Disc, + Tax) $ 23523 |
| Warranty |
| Allowance $ 16740 |
| Close-Out − $ 163 40 |
| Cash Down + $ 3660 |
| Total Down − $ 3660 |
| Balance · $ 19 245 |

| Term 46 |
| Residual Value $ _____ |
| Insurance $ _____ |
| Life ☐ |
| Life & A/H ☐ |
| None ☐ |

THIS NOTICE BELOW MUST BE TORN OFF AND GIVEN TO THE APPLICANT(S). IF THE INFORMATION IS TAKEN OVER THE PHONE, THE NOTICE MUST BE READ TO THE APPLICANT(S) IN ITS ENTIRETY.

**NOTICE REGARDING CREDIT REPORTS.** In connection with your application or any update, extension or renewal of any credit we extend you as a result of the application, a credit report may be requested from a credit reporting agency. Upon request, we will tell you if a credit report was requested and, if so, the name and address of the credit reporting agency furnishing the credit report. To request the information, call (716) 633-2050 or write M&T Bank, Auto Credit Department, Amherst Center, 1100 Wehrle Drive, P.O. Box 767-8 Buffalo, New York 14240.